## Case No. 17,465.

**WETHERILL et al. v. PASSAIC ZINC CO. et al.**

[6 Fish. Pat. Cas. 50; [1] 2 O. G. 471; 4 Leg. Gaz. 329: 9 Phila. 385; 29 Leg. Int. 357; 16 Int. Rev. Rec. 156.]

Circuit Court, D. New Jersey. Oct. 14, 1872.

CONSTRUCTION OF CONTRACTS — LICENSES UNDER PATENTS—EXTENSION OF PATENT— INJUNCTION—BOND.

1. The interpretation of a contract is to be determined by the sense in which the parties intended to use the terms employed to express it; and this must be gathered from the instrument itself, irrespective of declarations, written or oral, by either party, as to his understanding of its meaning, or as to his motives in making it.

2. A sale of two-thirds of a certain lease of land, including steam-engine, tools, and all appurtenances, and also of "two-thirds of all his machinery, furnaces, engines, retorts, buildings, and materials whatsoever, now on or about the premises of the Wetherill Zinc Company, in the town of Wetherill, Pennsylvania, with rights to use all his patents and processes for the manufacture of zinc oxide, metallic zinc, retorts, etc., which said Wetherill now has, or has in contemplation to obtain, it being understood that the patents heretofore referred to mean only those which he holds in his own right," *held* to be a license to use the process in those buildings only and not a general license.

3. The words restricting the grant to such patents as the grantor "holds in his own right," apply to such as he was the apparent, but not the real owner of, and a patent of which he holds only a part interest will, nevertheless, pass under the conveyance.

4. The words "all patents and processes which he has, or has in contemplation to obtain," merely serve to individuate the patents, and do not convey the extended term.

[Cited in Johnson v. Wilcox & G. S. M. Co., 27 Fed. 691.]

5. A license to use an invention "for the whole term of the patent which may be granted," given before the patent was issued, does not authorize the use of it under the extended term.

6. The case of Wilson v. Rousseau, 4 How. [45 U. S.] 669, must be considered as determining the construction of section 18 of the act of 1836 [5 Stat. 124].

7. The right to use a patented process, during the original term of the patent, under section 18 of the act of 1836, re-enacted in the act of 1870 [16 Stat. 198], does not authorize the use of it after the patent is extended.

8. There is a broad distinction between the use of an invention and the use of a patented machine. While the right to use the invention expires with the end of the term of the original patent, the right to the continued use of the machine, which embodies it, is protected.

9. Wilson v. Turner [Case No. 17,845] and Day v. Union India-Rubber Co. [Id. 3,691] commented on.

10. A bond with sufficient security allowed, instead of final injunction.

[This was a suit by Samuel Wetherill and others against the Passaic Zinc Company and others for alleged infringement of letters

---

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

patent No. 13,806, for a process of making white oxide of zinc. Final hearing on pleadings and proofs.]

[The validity of the plaintiffs' patent was not disputed, nor the fact of the use of the plaintiffs' patented process; but it was insisted that by reason of certain contracts the defendants were licensed to use the invention, during the extended term of the patent, at their New Jersey works.] [2]

George Harding, for complainants.

E. W. Stoughton and George Gifford, for defendants.

McKENNAN, Circuit Judge. There is no contention as to the complainants' title to the invention described in the patent set up in the bill, or as to the use of such invention by the defendants. The patent is for an improved process in the manufacture of white oxide of zinc, which Manning and Squier claim to have acquired a license to use during the term of the original patent, and the real and decisive inquiry in the cause is whether, by the true construction of this license, or by operation of section 18 of the act of July 4, 1836, re-enacted by section 67 of the act of July 8, 1870, the use of this process was authorized after the term of the extended patent began.

The construction of the agreement of March 17, 1860, between Manning and Squier and Wetherill, is not altogether free from difficulty. Its phraseology is peculiar. It provides for the sale, by Wetherill, to Manning and Squier, of two-thirds of his mineral lease of land in Lehigh county, from Jacob Correll, including the steam-engine, tools, and all appurtenances, and also of "two-thirds of all his machinery, furnaces, engines, retorts, buildings, and materials whatsoever, now on or about the premises of the Wetherill Zinc Company, in the town of Wetherill, Pennsylvania, with rights to use all his patents and processes for the manufacture of zinc oxide, metallic zinc, retorts, etc., which said Wetherill now has, or has in contemplation to obtain * * * it being understood that the patents hitherto referred to mean only those which he holds in his own right." The interpretation of this contract is to be determined by the sense in which the parties intended to use the terms employed to express it; and this must be gathered from the instrument itself, irrespective of declarations, written or oral, by either party, as to his understanding of its meaning, or as to his motives in making it. But in and of such an inquiry it is proper to consider facts cognate to the subject of the contract and within the knowledge of the parties, to which it may, therefore, be presumed that the stipulations of the contract were intended to be applied, and by which their effect and meaning were to be governed.

[2] [From 2 O. G. 471.]

The subject-matter of the first clause of the contract was the Correll mineral lease, two-thirds of which is sold to Manning and Squier; "and also" a two-thirds interest in the machinery, furnaces, engines, buildings, and materials then on or about the premises of the Wetherill Zinc Company, at Wetherill, "with" rights to use Wetherill's patents and processes for the manufacture of zinc oxide, etc., which he then had, or had it in contemplation to obtain. Now, it is clear that the interests conveyed in this lease, and the machinery, etc., are separate and independent, because that is expressed in unambiguous and appropriate words. But are the rights to use the patents and processes dissociated from the use of the machinery, etc., by terms of like import? They are granted together, apparently as inseparable parts of a single subject-matter, or, at least, as if they had some understood dependency upon each other. Two-thirds of the ownership of the buildings, machinery, etc., are transferred not as a distinct subject, but "with" rights to use certain patents and processes related to the uses for which the buildings and machinery were designed and employed. They are thus associated in the same clause, and are conveyed together in terms implying that the right to one is necessary to the appropriate enjoyment of the other. Where, then, were these processes to be used, and in what connection? Where else than at the place at which the appliances were provided, which might be adapted to the employment of all the processes comprehended in the grant, as they already were to some of them? For what other purpose can it be supposed the parties understood Wetherill to unite Manning and Squier with him in the ownership of the premises, unless it was to secure their continued and successful use in the production of zinc in some of its forms, and what more conducive to this purpose than to authorize the use of necessary methods, of which he had the monopoly? I do not, therefore, think it an unwarranted inference, from the words and tenor of the contract, that the parties intended the right to use Wetherill's patents and processes to be exercised in connection with the buildings, machinery, furnaces, engines, retorts, and materials granted with it, and consequently that such use was intended to be local and restricted.

It is urged, however, that a right to use Wetherill's patented process for the manufacture of zinc oxide was not conveyed by the contract. This conclusion is founded upon the alleged effect of the concluding sentence of the first clause of the contract, which is, "it being understood that the patents hitherto referred to mean only those which he holds in his own right." Before the date of the contract Wetherill had transferred interests in his process patent to Chas. J. Gilbert and others, and was then only part owner of it; and it is therefore argued that he did not

hold it in his own right. That he was owner in part of this patent is undoubted, and that to the extent of his interest he held it in his own right is also clear. Now, the qualifying words above quoted apply only to such patents as he was the apparent but not the real owner of, nor do they exclude patents of which his tenure was not exclusive. He was the patentee of the process for manufacturing white oxide of zinc, and to the extent of his untransferred interest he was competent to dispose of it, because he held it in his own right. He did dispose of part of this interest, expressly limiting the operation of his conveyance to such interests as he was the real owner of. But it must be further observed that this process patent was the only one for the manufacture of zinc oxide then held by Wetherill. The right to use it was clearly conveyed by the contract, and it was the only patent then to which the words of the grant would apply. To exclude it from the operation of an unambiguous conveyance by giving this effect to the restricting clause, which .its terms do not clearly require, would violate a familiar rule of construction, which assigns to a proviso the office only of qualifying the context, not of withdrawing from a grant a subject plainly embraced by it.

But assuming that the construction given to the contract is erroneous, and that the license in dispute was unrestricted as to the place of its enjoyment, it is necessary to inquire whether it extended beyond the terms of the original patent by the stipulation of the contract, or by operation of section 18 of the act of 1836.

A license or contract for the use of an invention is subject to the same rules of construction which apply to any other contract. The intention of the parties, as expressed in the contract, is to be ascertained, and effect must be given to it accordingly. A transfer of an interest in a subsisting patent will not extend beyond the term of the patent, unless there are words indicating an intention to convey more than a present interest. This rule was applied in Wilson v. Rousseau, 4 How. [45 U. S.] 646, and in numerous other cases, and, I think, is clearly recognized in Philadelphia, W. & B. R. Co. v. Trimble, 10 Wall. [77 U. S.] 367, and in Nicolson Pavement Co. v. Jenkins, 14 Wall. [81 U. S.] 452. In Philadelphia, W. & B. R. Co. v. Trimble, the language of the contract manifestly embraced an extended term of the patent In reference to it, the court say: "The language employed is very broad; it includes alike the patents which had been issued and all which might be issued thereafter. . . . The entire inventions and alterations and improvements, and all patents relating thereto, whensoever issued, to the extent of the territory specified, are within the scope of the terms employed. No other construction will satisfy them. Upon the fullest consideration, we have no doubt such was the meaning and intent of the parties." The language employed in Nicolson Pavement Co. v.

Jenkins [supra] is not so broad. but the court held it to be equally significant of an intention to convey an interest in the extended term. "Manifestly something more was intended to be assigned than the interest then secured by letters patent. The words 'to the full end of the term for which the said letters patent are or may be granted' necessarily import an intention to convey both a present and a future interest, and it would be a narrow rule of construction to say that they were designed to apply to a reissue merely when the invention itself, by the very words of the assignment, is transferred."

The words of the contract in this case are, "with rights to use all his patents and processes for the manufacture of zinc oxides, metallic zinc, retorts, etc., which said Wetherill now has or has in contemplation to obtain." Now, I think the significance of the words "now has or has in 'contemplation to obtain," is merely to individuate the patents which the contract was intended to embrace. and has no reference to the renewal or extension of such patents. Two classes of subjects are referred to: patents for the manufacture of zinc oxide, metallic zinc, and for retorts, which Wetherill then held, and patents for the like subjects, which. he intended to obtain, but which had not been granted. They were intended, then, to show that not only processes of which he held the monopoly by patent, but also those of which he proposed to secure the monopoly by obtaining patents therefor, were to be covered by the contract. And this interpretation is confirmed by the fact that he had shortly before filed caveats for inventions relating to the manufacture of zinc, which he had not then perfected, and for which, of course, when matured, he contemplated obtaining patents. In the absence of any words, therefore, indicating an intention to deal with more than a present interest in the patent in question. the license stipulated for must be held to run only during the term of the original patent.

And the same conclusion is applicable to the scope of the license granted by S. T. Jones to the Passaic Zinc Company, because by the terms of agreement between him and Wetherill, he was authorized to sell licenses to use "the invention of the improvement in the process for manufacturing the white oxide of zinc, for which he (Wetherill) has applied for letters patent." only "for the whole term of the patent which may be granted." This is an express limitation of Jones' authority to sell licenses to the term of the patent for which Wetherill's application was then pending; and no one, therefore, purchasing a license from him would acquire a larger interest than he had the power to convey.

But is the right to use the process in question secured to the licensees, during the term of the extended patent, by section 18 of the act of 1836? It is thereby enacted that "the benefit of such renewal shall extend to as-

signees and grantees of the right to use the thing patented, to the extent of their respective interests therein." The construction and effect of this clause have been considered by the supreme court in several cases, involving the right to use machines after the end of the original term of the patent, but in no case has the effect of the clause, upon a license to use a process, been expressly determined by that court. But if the court has defined the meaning of the statute, a loyal respect for its authority demands that it should be followed, although the subject-matter to which its ruling was applied may be different from that out of which the present controversy has grown.

In Wilson v. Rousseau, 4 How. [45 U. S.] 669, the question was presented, whether, by force of section 18 of the act of 1836, an extended patent, granted to Woodworth's administrator for his planing-machine, inured to the benefit of an assignee under the original patent, and the court held that it did not, but that it protected only purchasers or owners of machines during the original term, in the mere use of them after the end of that term. This conclusion necessarily involved a determination of the true meaning and scope of section 18, and in reference to it the court say: "The extension of the patent, under section 18, is a new grant of the exclusive right or monopoly in the subject of invention for seven years. All the rights of assignees or grantees, whether in a share of the patent or to a specified portion of the territory held under it, terminate at the end of the fourteen years, and become reinvested in the patentee by the new grant. From that date he is again possessed of the 'full and exclusive right and liberty of making, using, and vending to others the invention,' whatever it may be. Not only portions of the monopoly held by assignees and grantees as subjects of trade and commerce, but the patented articles or machines throughout the country, purchased for practical use in the business affairs of life, are embraced within the operation of the extension. This latter class of assignees and grantees are reached by the new grant of the exclusive right to use the thing patented. Purchasers of the machines, and who were in the use of them at the time, are disabled from further use immediately, as that right became vested exclusively in the patentee. Making and vending the invention are prohibited by the corresponding terms of his grant."

And again: "Against this view it may be said that 'the thing patented' means the invention or discovery, as held in McClurg v. Kingsland, 1 How. [42 U. S.] 202, and that the right to use 'the thing patented' is what, in terms, is provided for in the clause. That is admitted; but the words, as used in the connection here found, with the right simply to use the thing patented. not the exclusive right, which would be a monopoly, necessari-

ly refer to the patented machine and not to the invention; and, indeed, it is in that sense that the expression is to be understood generally throughout the patent law, when taken in connection with the right to use in contradistinction to the right to make and sell.

"The 'thing patented' is the invention; so the machine is the thing patented, and to use the machine is to use the invention, because it is the thing invented, and in respect to which the exclusive right is secured, as is also held in McClurg v. Kingsland [supra]. The patented machine is frequently used as equivalent for the 'thing patented,' as well as for the invention or discovery, and no doubt when found in connection with the exclusive right to make and vend always means the right of property in the invention—the monopoly; but when in connection with the simple right to use, the exclusive right to make and vend being in another, the right to use the thing patented necessarily results in a right to use the machine and nothing more. Then, as to the phrase, 'to the extent of their respective interests therein,' that obviously enough refers to their interests in the thing patented, and in connection with the right simply to use. means their interests in the patented machines. be that interest in one or more, at the time of the extension.

"This view of the clause, which brings it down in practical effect and operation to the persons in the use of the patented machine or machines at the time of the new grant, is strengthened by the clause immediately following, which is, 'that no extension of the patent shall be granted after the expiration of the term for which it was originally issued.'"

To the same effect is Bloomer v. McQuewan, 14 How. [55 U. S.] 547. The opinion of the court was delivered by the chief justice, and, while he adopts fully the reasoning of the opinion in Wilson v. Rousseau [supra], he expounds, at some length, the reasons for which the distinction is made in the act of 1836, between assignees of a share of the monopoly and the purchasers of machines to be used in the ordinary pursuits of business.

A broad distinction is thus indicated between the use of an invention and the use of a patented machine. While the right to the use of the invention expires with the end of the term of the original patent, the right to the continued use of the machine, which embodies it, is protected. The law did not intend to revive an assignment or grant which expired with the term of the original patent, but to protect a species of tangible property. sold by the patentee, the value of which depended chiefly upon the owner's right to use it, and which, without some saving provision, would fall within the grasp of the exclusive rights vested in the patentee by the extension. It was manifestly, then, something less than the entire right to use the invention which the act contemplated. What that is, is clearly stated in the opinion of the court. not as a dictum of the judge who de-

livered it, but as an exposition of the meaning of the act, which was necessary to a decision of the cause. "The thing patented" is the subject of the use, and the court say, where these words are employed in the act in connection simply with the right to use, they refer only to the patented machine, and not to the invention. This, then, is an authoritative definition of their significance in the clause in question, and they must therefore be taken to mean a specific machine, and, in connection with the other words of the clause, to confer a right to use it, "nothing more." And it has since been held that this right is restricted to the mere use, and does not cover the reconstruction of the machine. It necessarily follows that this saving clause is applicable only to inventions which are susceptible of embodiment in a substantial and tangible form, and not to those which consist in a formula for producing prescribed results, and when those results are obtained, there is an end of the thing patented, and which, as often as it is employed in practice, involves the renewed use or reproduction of the entire invention.

But it is urged that where a process requires the use of a peculiar machine or apparatus for its practice, the right to use the process until the apparatus is worn out is within the protection of the act. If the title to both was concentrated in the same person and by the same patent, the argument would have, perhaps, unanswerable force. But where it is held by different persons and under distinct patents, it is difficult to see how a grant of an interest in one can carry with it any interest in the other. Burrows was the patentee of a furnace adapted to the use of Wetherill's process, and by Burrows' assignment the respondents acquired a right to use it. But that assignment did not touch Wetherill's invention, and they had no right to practice it in the Burrows furnace without Wetherill's authority. When they obtained his authority, the contract which granted it was the sole source of their right, and had no dependent relation to a distinct contract with another. If Burrows' assignment conveyed an interest in his invention alone, and gave no right whatever to the use of Wetherill's, an extension of the patents for either or both of them could not operate to establish an inseparable connection between them. The only effect of the saving clause in question is to continue the right to use a patented machine after the renewal of the patent, where such right was derived from an assignment or grant by the patentee, and it can not, by any constructive expansion, be made the source of a right in the creation of which the patentee had no agency.

Two cases have been referred to, in which a broader effect is given to the act of 1836 than is ascribed to it in Wilson v. Rousseau, and which demand only a brief notice.

The first of these is Wilson v. Turner [Case No. 17,845], in which the defendant was the owner of a Woodworth planing-machine, by virtue of an assignment of an interest in the original patent, and claimed the right to use it after the extension of the patent. Chief Justice Taney delivered the opinion of the circuit court, dismissing the bill on the ground that the act of 1836 extended the entire right vested by the assignment during the term of the renewed patent. The cause went to the supreme court, and was there heard in connection with Wilson v. Rousseau. Although the decree of the circuit court was affirmed, it was expressly for the reasons stated in Wilson v. Rousseau, the chief justice concurring in the opinions in both cases. The restricted operation there given to the act is irreconcilable with the construction of it in the court below, and the judgment must therefore be taken as a distinct rejection of the broad views of the chief justice in the circuit court, as indicative of a change of opinion on his part.

In Day v. Union India-Rubber Co. [Case No. 3,691], the learned judge of the circuit court adopted the views of Chief Justice Taney in Wilson v. Turner [supra], and held that the act of 1836 protected the continued use of a process by a licensee under the original patent. Upon this interpretation of the act the judge rested his decision of the cause, and supported it by an elaborate and impressive argument. This case also went to the supreme court, and is reported in 20 How. [61 U. S.] 216. The same judge who delivered the opinion in Wilson v. Rousseau also delivered the opinion of the court in this case, and he puts its decision upon the ground that the license set up by the defendants in terms covered the extended term of the patent, and he does not advert at all to the view taken in the circuit court of the act of 1836. It is obvious, therefore, that the effect of the act was an immaterial question, and that the silence of the court in regard to it does not imply any approval of the views of the judge of the circuit court. Thus unimpugned by any authorized doubt or denial of its soundness, Wilson v. Rousseau must be regarded as determining the meaning of the act, and its consequent inapplicability to the defense of the respondents.

The patent of Wetherill was extended on November 13, 1869. The Passaic Zinc Company used his processes after that date, and so was an infringer. It is unnecessary, therefore, now to determine the effect of its agreements with Manning and Squier upon its liability as an infringer after their date.

The complainants are entitled to an injunction and an account, and a decree will be entered therefor; but if the respondents, within twenty days, give bond in such sum, with security, as the court or judge thereof shall approve, to secure the payment of the profits and damages hereafter decreed against them, the issuing of the injunction will be suspended until the further order of the court.

[For other cases involving this patent, see note to Wetherill v. New Jersey Zinc Co., Case No. 17,463.]